NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**ALYCE RENE TINCHER,**

        **Plaintiff,**

**v.**                                                        **Case No. 6:14-cv-467-Orl-18KRS**

**COMMISSIONER OF SOCIAL SECURITY,**

        **Defendant.**

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

This cause came on for consideration without oral argument on the Complaint filed by Plaintiff Alyce Rene Tincher seeking review of the final decision of the Commissioner of Social Security denying her claim for social security benefits, Doc. No. 1, the answer and certified copy of the record before the Social Security Administration ("SSA"), Doc. Nos. 14, 15, 16, and the parties' Joint Memorandum,[1] Doc. No. 26.

## PROCEDURAL HISTORY.

In 2011, Tincher filed applications for benefits under the Federal Old Age, Survivors and Disability Insurance Programs ("OASDI"), 42 U.S.C. § 401, *et seq.*, and under the Supplemental Security Income for the Aged, Blind and Disabled Program ("SSI"), 42 U.S.C. § 1381, *et seq.*

---

[1] I required counsel for the parties to submit a single, Joint Memorandum with an agreed statement of the pertinent facts in the record. Doc. No. 18. Counsel for Plaintiff was ordered to identify and frame, in a neutral fashion, each of the disputed issues raised as grounds for reversal and/or remand, and counsel for the Commissioner was required to respond to each of those issues in the format set forth in the Scheduling Order. *Id.* at 4.

Not for Publication

(sometimes referred to herein as the "Act"). She alleged that she became disabled on May 1, 2005. R. 157, 164. She subsequently amended the alleged disability onset date to June 28, 2010, because she had engaged in substantial gainful activity ("SGA") after the originally alleged onset date. R. 48.

After her applications were denied originally and on reconsideration, Tincher asked for a hearing before an Administrative Law Judge ("ALJ"). R. 101. An ALJ held a hearing on May 22, 2012. Tincher, accompanied by an attorney, and a vocational expert ("VE") testified at the hearing. R. 44-63.

After considering the hearing testimony and the evidence in the record, the ALJ found that Tincher was insured under OASDI through June 30, 2011. The ALJ concluded that Tincher had not engaged in substantial gainful activity since the amended alleged disability onset date. R. 28.

The ALJ found that Tincher had depression, anxiety, and polysubstance abuse and that she was status post cervical spine surgeries, which were severe impairments. *Id.* These impairments, individually and in combination, did not meet or equal a listed impairment. *Id.* The ALJ found that Tincher would have mild restrictions in activities of daily living, moderate difficulties in social functioning and concentration, persistence or pace and that she had not had an episode of decompensation of extended duration after the amended disability onset date. R. 29.

The ALJ concluded that Tincher had the residual functional capacity ("RFC") to perform light exertional work with certain limitations, as follows:

> In terms of exertional limitations, the claimant is able to lift twenty pounds occasionally and ten pounds frequently. The claimant can sit for six hours and stand for six hours in an eight-hour workday. The claimant is limited to walking twenty minutes at a time based on

NOT FOR PUBLICATION

> her testimony. The claimant's mental impairments limit the claimant to more than simple routine work, but not complex work. The claimant cannot more than frequently interact with the public and no more than occasional interaction with coworkers.

R. 30 (internal footnotes omitted).

The ALJ determined that Tincher could not return to her previous work. R. 36. After considering the testimony of the VE, the ALJ concluded that Tincher could perform unskilled, light exertional jobs available in the national economy, specifically folder, pricer and housekeeper. R. 37. Therefore, the ALJ concluded that Tincher was not disabled. *Id.*

Tincher sought review of the ALJ's decision by the Appeals Council. R. 14. On December 19, 2013, the Appeals Council found no reason to review the ALJ's decision. R. 1-3.

Tincher now seeks review of the final decision of the Commissioner by this Court.

## JURISDICTION AND STANDARD OF REVIEW.

Tincher having exhausted her administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3). A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

## SUMMARY OF THE FACTS.

After a thorough review of the record, I find that the facts are adequately stated in the parties' Joint Memorandum and the ALJ's decision, which statement of facts I incorporate by reference. Accordingly, I will only summarize facts pertinent to the issues raised to protect Tincher's privacy to the extent possible.

NOT FOR PUBLICATION

Tincher was born in 1963.  R. 157.  She received a GED in 1987.  R. 197.  She previously worked as an electronics assembler in 2010, but she was terminated when the program for which she was hired ended.  After her termination, she received unemployment compensation through at least March 2012.  R. 50, 60, 263.

At the ALJ's hearing, Tincher testified that she was unable to sit or stand for more than 15 to 25 minutes.  R. 50, 52.  She could walk about 20 minutes before needing to take a break.  R. 52.  She experienced migraine headaches 2 to 4 times a week which lasted from 6 to 24 hours.  Neck pain also radiated into her arms and caused loss of grip strength.  Her anxiety made it difficult for her to function during the day.  R. 50-51.  She also had depression that affected her work attendance.  R. 53, 60.  She had problems with memory that caused her to miss little details.  R. 59.

In a written report, Tincher indicated that she had drowsiness, dizziness and impairment in her balance as side effects of medication.  R. 205-06.  In another written report, Tincher indicated that medication caused insomnia, memory loss, lack of interest, fatigue, drowsiness, restlessness and bad dreams.  R. 220.  At the ALJ's hearing, Tincher testified that she had been out of medication for some time due to lack of insurance.  R. 51.

During a good day, Tincher could vacuum one room at a time taking most of the day to complete the task.  R. 53.  She did very little cooking.  She could drive to run errands.  R. 54.  She talked with friends on the telephone and got together with them about twice a month.  R. 55.  In a written report, Tincher stated that she had difficulty working with her arms above her head.  Her son did the laundry following her instructions.  R. 205.  She was able to feed her pets and open the door to let them outside, although she also wrote that her son bent down to get the water

4

and food bowls and filled them.  R. 214.  In December 2011, she indicated in a written report that she could walk her dog but she could not go out as long as she had previously been able to do.  R. 249.

*Mental Impairments.*

Medical records confirm that Tincher had a long history of mental impairments.  In 2005, she was hospitalized due to suicidal ideation.  The diagnoses on discharge were major depressive disorder, recurrent and moderate without psychotic features and cannabis abuse.  R. 272.  Thereafter, she was treated at Circles of Care by Brian Braumiller, D.O., and Milan Mukerji, M.D.  *See, e.g.*, R. 464-69, 481-501.  Treatment notes long before the amended disability onset date also reflect diagnoses of bipolar disorder and polysubstance abuse.  *See, e.g.*, R. 492.

From May 10, 2010, through July 28, 2011, Dr. Mukerji observed that Tincher was mildly depressed and mildly to moderately anxious.  She was oriented and her affect was appropriate.  Her judgment and insight were fair.  The diagnoses were depressive disorder NOS and generalized anxiety disorder.  R. 454, 477-79.  On May 10, 2010, Dr. Mukerji rated Tincher's global assessment of functioning ("GAF") score at 65.[2]  R. 480.

On April 14, 2011, Dr. Braumiller observed that Tincher was "doing really well on the medications."  The diagnosis was bipolar disorder NOS.  Tincher's GAF score was 70.  R. 438.  On April 27, 2011, Dr. Braumiller observed that Tincher's affect was bright and her mood pleasant.  Her thought processes were linear, and her judgment, insight and memory were good.  Nevertheless, Dr. Braumiller wrote that it appeared the Tincher had a strong anxiety disorder.

---

[2] A GAF score of 61 to 70 reflects some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. Harold I. Kaplan, M.D. & Benjamin J. Sadock, M.D., Synopsis of Psychiatry 299 (8th ed. 1998).

5

His diagnoses were depressive disorder and anxiety disorder NOS. He rated her GAF score at 70. R. 437.

On May 19, 2011, Dr. Braumiller observed that Tincher was crying, sad, depressed, nervous and anxious. Nevertheless, her judgment, insight and memory were good. The diagnoses were depressive disorder and anxiety disorder NOS. Dr. Braumiller adjusted her medication. He rated her GAF score at 70. R. 431; *see also* R. 538 (Tincher told a primary care physician that she was struggling in her relationship with her boyfriend and with her son and having severe mood swings.).

On June 6, 2011, Dr. Braumiller observed that Tincher's affect was bright and her mood was pleasant. Her thought process was linear, and her judgment, insight and memory were good. The diagnoses were depressive disorder and anxiety disorder NOS. Dr. Braumiller continued to rate Tincher's GAF score at 70, and he wrote that she was stable. R. 436.

On June 20, 2011, Tincher returned to Dr. Braumiller to fill out her disability paperwork. Dr. Braumiller observed that Tincher's affect was sad and her mood was depressed. Her thought process was linear, and her judgment, insight and memory were good. He noted that her stressors were getting her paperwork filled out for disability. His diagnosis was bipolar disorder NOS. He continued to rate her GAF score at 70. Nevertheless, Dr. Braumiller wrote, "She cannot focus, can't concentrate, so we will give her disability." R. 456. On the same day, Dr. Braumiller completed a mental functional capacity assessment form. He checked boxes indicating that Tincher had moderate to marked limitations in several areas of mental functioning. He did not complete the portion of the form asking him to describe the medical/clinical findings that supported his assessment. R. 442-43.

NOT FOR PUBLICATION

Dr. Mukerji examined Tincher on July 28, 2011.  Tincher complained of anxiety due to family problems and financial problems.  Dr. Mukerji observed that Tincher's affect was mildly depressed and moderately anxious.  Her judgment and insight were fair.  The diagnoses were depressive disorder NOS and generalized anxiety disorder.  He adjusted her medication.  R. 454.

On August 3, 2011, Lee Reback, Psy.D., prepared a mental RFC assessment after review of Tincher's records.  Dr. Reback opined that Tincher would have mild restrictions in activities of daily living and moderate difficulties in social functioning and concentration, persistence or pace.  R. 516.  Specifically, Dr. Reback opined that Tincher would be moderately limited in the ability to maintain attention and concentration for extended periods and complete a normal workday and work week without interruptions from psychologically based symptoms.  She would also be moderately limited in the ability to interact appropriately with the public and coworkers, and in the ability to respond appropriately to changes in the work setting.  In the functional capacity assessment portion of the form, Dr. Reback wrote that Tincher appeared capable of daily and routine activities.  R. 502-04.

On November 3, 2011, Theodore Weber, Psy.D., prepared a mental functional capacity assessment based on review of Tincher's records.  He opined that Tincher would be moderately limited in the ability to understand, remember and carry out detailed instructions and in the ability to complete a normal work day and work week due to psychologically based symptoms.  She would also be moderately limited in the ability to accept instructions and respond appropriately to criticism from supervisors and in the ability to set realistic goals or make plans independently of others.  R. 560-76.  In summary, Dr. Weber opined as follows:

> Tincher could understand and remember simple instructions but she would have difficulty with more detailed instructions;

7

> She could complete simple tasks/work procedures and make work decisions but she would have difficulty with maintaining attention and concentration for extended periods and carrying out detailed instructions;
>
> She could cooperate and be socially appropriate but she would have difficulty accepting criticism from supervisors; and,
>
> She could react/adapt appropriately to the work environment but she would have difficulty setting realistic goals.

R. 576. Dr. Weber further opined that Dr. Braumiller's functional capacity assessment was not consistent with his treatment notes or with Tincher's activities of daily living ("ADLs"). *Id.*

*Physical Impairments.*

Tincher also had a history of neck pain for which she was treated with 2 cervical fusion surgeries, the first in April 2009 and the second on June 28, 2010. R. 291. Richard Hynes, M.D., her treating physician, wrote in 2010 that Tincher's pain was largely relieved after the first surgery, and that the second surgery was performed to address residual pain from possible pseudoarthrosis. R. 293. On July 8, 2010, Tincher reported that she had significant improvement. A physician's assistant ("PA") in Dr. Hynes' office allowed Tincher to do modified activities, avoiding repetitive bending, stooping, twisting, climbing or crawling. R. 321. On July 20, 2010, the PA permitted Tincher to sit, stand and walk as tolerated. R. 319.

On August 5, 2010, Tincher reported that she was having severe spasms and cervicogenic headaches. Upon examination, a PA in Dr. Hynes' office observed tenderness and restricted range of motion in the lower extremities. The impression was chronic cervicalgia and myofascial spasms of the cervical spine. Medication and physical therapy to strengthen the torso and extremities were prescribed. R. 317. On August 13, 2010, the PA observed that Tincher showed mild anxiety due to moderate discomfort and the need to return to work to generate

NOT FOR PUBLICATION

income. Tincher reported her pain was 0 on a 10-point pain scale. She was permitted to return to work 3 days a week with restrictions of no lifting over 10 pounds and no overhead work. R. 313. On September 20, 2010, Tincher continued to complain of myofascial spasms and cervicogenic headaches at a level of 4 to 5 on a 10-point pain scale. R. 312.

On November 15, 2010, Tincher told S. Farhan Zaidi, M.D., a physician in Dr. Hynes' practice group, that she was feeling much better since the second surgery. She still had neck pain that at times radiated to her shoulders, intermittent numbness in a finger on her left hand and spasms in her arms. She rated her pain at 1 on a 10-point pain scale. R. 308. Upon examination, Dr. Zaidi observed decreased range of motion in the cervical spine and generalized tenderness in Tincher's neck and trapezius region. Her upper extremity strength was 5/5 bilaterally. Urinalysis testing was positive for use of barbiturates, opioids and marijuana. Dr. Zaidi cautioned her not to use illegal drugs and warned her about mixing her prescribed medication. *Id.*

As of November 19, 2010, Tincher had begun physical therapy. A PA in Dr. Hynes' office indicated that Tincher would continue with modified activities, avoiding repetitive bending, stooping, twisting, and overhead reaching. R. 305. Dr. Hynes planned to wean Tincher off narcotic medication. R. 305, 310. The PA anticipated that after 2 months of physical therapy, Tincher would be able to tolerate full-time duty without any complications. R. 305.

On March 10, 2011, Tincher complained of pain at a level of 9/10. She admitted that it had been a few months since she last took her medication. A PA in Dr. Hynes' office observed that Tincher's overactivity had caused an increase in her pain. Upon examination, the PA noted a very guarded posture, myofascial spasms, and tenderness with diminished range of motion.

Her medication was refilled. The PA allowed Tincher to continue with modified activities, avoiding any repetitive bending, stooping, twisting, climbing, and crawling. She could sit, stand and mobilize as tolerated. She was to continue with home conditioning exercises. R. 302.

On July 21, 2011, Dr. Hynes prepared an RFC questionnaire. He described Tincher's symptoms as including neck pain, reduced range of motion, stiffness and fatigue. He opined that Tincher could lift up to 10 pounds frequently and up to 20 pounds occasionally. She would be limited in repetitive reaching, handling or fingering due to problems with her cervical spine. She could sit 20 minutes and stand or walk 20 to 30 minutes at a time. She could sit, stand or walk up to 5 to 6 hours a day. She would need to be able to shift positions. Her impairments would often to frequently interfere with the attention and concentration required to perform simple, work-related tasks. She would need to recline or lie down during the work day "depending on [the] job," and she would need to take unscheduled breaks. She would likely be absent from work up to 4 times a month. R. 446-47.[3]

On July 25, 2011, Bradley Watt, D.C., Tincher's treating chiropractor, also prepared an RFC questionnaire.[4] *See* R. 581-709 (Dr. Watt's treatment notes). He wrote that Tincher had neck pain radiating into her right trapezius, mid and lower back pain and headaches. He opined that Tincher could sit 30 minutes at a time for up to 4 hours a day, and stand/walk 15 minutes at a time up to 1 hour a day. She could lift up to 10 pounds occasionally. She would have limitations in repetitive reaching, handling and fingering. She did not have any side effects of

---

[3] In February 2012, a PA in Dr. Hynes' practice completed another physical RFC questionnaire that was substantially similar to the form completed by Dr. Hynes. R. 716.

[4] The Commissioner's objection to referring to Bradley Watt as Dr. Watt should be overruled. The ALJ recognized that Watt was a chiropractor, yet he referred to him as Dr. Watt in his decision. R. 35.

medication. She would need to recline or lie down during the day and take unscheduled breaks. Dr. Watt opined that Tincher's impairment would frequently be severe enough to interfere with the attention and concentration required to perform simple work-related tasks, and that she would miss work 3 or 4 times a month. R. 450-51.

Tincher was involved in a motor vehicle accident on July 4, 2011. She returned to Dr. Hynes' office in August complaining of increased neck pain, vertigo and chronic dull headaches with nausea. Upon examination, tenderness was observed in the trapezius muscles bilaterally, and she had restricted range of motion with rotation and lateral bending on the left. Her upper extremity strength was 4/5 on the left and 5/5 on the right. R. 548.

An MRI of the cervical spine taken in August showed positive fusion of C4 through C7 with some annular bulging at C6-7. R. 550. The radiologist found no obvious recurrent disk protrusion. R. 551.

On September 1, 2011, a PA in Dr. Hynes' office observed on examination only mild tenderness in the cervical paraspinal muscles radiating into the trapezius muscles. Range of motion remained restricted, but upper extremity strength was 5/5 bilaterally. The diagnoses included cervicalgia and C6-7 facet arthropathy. She was treated with medication. R. 546.

On October 12, 2011, Tincher sought treatment from Kristin M. Gulliver, D.C., a chiropractor at Dr. Watt's practice. Tincher reported that she was doing better until she moved out of town and was unable to continue care. She had moved back to the area and was under stress from the move. She complained of neck and shoulder pain and headaches. R. 623. Upon examination, Dr. Gulliver observed some limitation in range of motion in the spine. R.

11

624. Dr. Gulliver opined that Tincher was in a subacute phase and that her symptomatology was "temporarily worse." She recommended home exercises as well as other treatments. R. 626-28.

On October 18, 2011, Sunita Patel, M.D., prepared a physical RFC assessment after review of Tincher's records. Dr. Patel opined that Tincher could lift 20 pounds occasionally and 10 pounds frequently. She could sit, stand or walk about 6 hours in an 8-hour workday. She could only occasionally stoop and crouch. She should avoid concentrated exposure to hazards. Dr. Patel noted that there was no evidence of significantly decompensating headaches over the previous year. R. 552-59.

On November 28, 2011, a PA in Dr. Hynes' office observed that Tincher did not have any cord compression, significant degeneration or herniation. Tincher complained of pain at 7/8 on a 10-point pain scale. A cervical right-sided paravertebral spasm was observed on examination. She was referred to a pain management physician. R. 579.

Tincher returned to Dr. Watt for treatment on January 11, 2012. She reported mid and low back pain, right shoulder pain and neck pain, but her head was feeling better. Dr. Watt found that Tincher had reached maximum medical improvement. R. 581-82. He prepared another RFC questionnaire. He opined that Tincher could lift up to 10 pounds occasionally. She could sit 30 minutes at a time up to 6 hours a day and stand/walk 15 minutes at a time up to 2 hours a day. She would need to change positions. She would have limitations in doing repetitive reaching, handling or fingering. She would need to take unscheduled breaks during the day, and she would miss work once or twice a month. R. 711-12.

On February 9, 2012, Tincher sought treatment at the Brevard Health Alliance. She complained of depression, agitation and mood swings. She requested hormone therapy to

12

NOT FOR PUBLICATION

address her mood swings. She also had chronic neck pain. She had quit pain management treatment. The treatment provider noted that Tincher's mood and affect showed anxiety, but her judgment, insight, and memory were intact. She was directed to re-establish with pain management if she needed pain medication. R. 529-30.

At the hearing, the ALJ asked the VE to assume a hypothetical person of Tincher's education and work experience who could do the following:

> [L]ifting to 20 pounds occasionally and 10 frequently; stand and sit six hours each in an eight hour workday; walking limited to 20 minutes at a time. I'm going to limit her to semiskilled, more than simple, routine but not complex and just occasional interaction with the public. . . . [J]ust occasional interaction with coworkers . . . .

R. 61. The VE testified that this hypothetical person could not perform any of Tincher's past relevant work. *Id.* The VE testified that the person could perform the light, unskilled jobs of folder, pricer[5] and housekeeper, which jobs existed in the national economy. R. 62. If the person would miss 3 or more days of work per month, the VE testified that there would be no jobs the person could perform. *Id.*

---

[5] Although the name of this job was inaudible, the *Dictionary of Occupational Titles* reference number for the job that was audible, 229.587-018, confirms that the VE identified the job of pricer. R. 62.

13

NOT FOR PUBLICATION

## ANALYSIS.

Tincher raises three assignments of error. She contends that the ALJ erred by failing to adopt all of the functional capacity limitations included in the RFC questionnaires prepared by Dr. Hynes and Dr. Braumiller. She also contends that the ALJ erred in finding that her reports of limitations arising from pain and other subjective symptoms were not entirely credible. Due to the first alleged error, she submits that the hypothetical question to the VE was incomplete. I will address only the first two issues in detail, because resolution of those issues also resolves the third issue.

*Weight Given to the Opinions of Treating Physicians.*

Dr. Hynes and Dr. Braumiller both treated Tincher. The opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004) (quotation omitted). Good cause exists when (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's medical records. *Id.* at 1240-41. The ALJ must articulate the reasons for giving less weight to the opinion of a treating physician. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). The ALJ need not, however, explicitly discuss every factor listed in the applicable regulations. *Lawton v. Comm'r of Soc. Sec.*, 431 F. App'x 830, 833 (11th Cir. 2011) (per curiam).[6]

---

[6] Unpublished decisions of the United States Court of Appeals for the Eleventh Circuit are cited herein as persuasive authority.

The ALJ gave great weight to the opinion of Dr. Hynes and PAs working under his supervision regarding Tincher's exertional functional capacity limitations. R. 34. He did not give significant weight to the opinions regarding Tincher's nonexertional limitations contained in the functional capacity questionnaire prepared by Dr. Hynes. R. 35. Tincher contends that the ALJ erred by rejecting Dr. Hynes' opinion regarding limitations in attention and concentration, the need to recline or lie down during a work day, the need to take unscheduled breaks, the requirement of a sit/stand option and the likelihood that she would miss work due to her impairments.

The ALJ articulated good cause supported by evidence in the record to support his decision. He correctly noted that Dr. Hynes did not indicate in the questionnaire the basis for his opinion regarding these nonexertional limitations. He also correctly stated that these nonexertional limitations were not contained in any of the treatment notes prepared by Dr. Hynes and the PAs. R. 35. He also relied on the record as a whole, which showed that Tincher's condition improved after each cervical fusion surgery. The ALJ noted evidence in the record of breakthrough pain, including after the motor vehicle accident. He found that "[e]ven during a temporary exacerbation, [Tincher] still had only modest loss in range of motion and strength, nothing that would preclude work with the light exertional range." R. 33 (citing R. 624-28 (Dr. Gulliver's treatment notes of October 12, 2011, in which she opined that Tincher was in a subacute phase and had temporary exacerbation of her symptoms following relocation and discontinuance of treatment)). Because the ALJ articulated evidence in the record that established that Dr. Hynes' opinion regarding these nonexertional limitations were conclusory and not supported by his own treatment records or the record as a whole, I recommend that the

15

Court find that the ALJ did not err by giving little weight to Dr. Hynes' opinion regarding these nonexertional limitations.

The ALJ also articulated good cause for not giving significant weight to the mental RFC questionnaire completed by Dr. Braumiller. He correctly observed that Dr. Braumiller did not state in the questionnaire the medical/clinical findings that supported his assessment. R. 35. He also correctly stated that on the day the questionnaire was completed, Dr. Braumiller observed that Tincher's thought process was linear and her judgment, insight and memory were good. Despite a GAF score of 70, which is indicative of only mild symptoms, Dr. Braumiller made the conclusory statement that he would give Tincher disability because she could not focus or concentrate. R. 35-36 (citing R. 472). The ALJ also articulated evidence from the record as a whole that undermined Dr. Braumiller's opinion in the questionnaire. The ALJ noted that Tincher had been able to work at substantial gainful activity levels despite her history of mental impairments and that nothing in the record supports a finding that Tincher's mental condition deteriorated significantly after the amended disability onset date. R. 36. Because Dr. Braumiller's opinion in the questionnaire was conclusory and not supported by his own treatment records or the evidence as a whole, I recommend that the Court find that the ALJ did not err in his treatment of Dr. Braumiller's mental functional capacity assessment.

To the extent that Tincher asserts that the ALJ erred by relying on the opinions of reviewing physicians, I recommend that the Court find that this issue is also not well taken. "[A]fter independently discounting a treating physician's opinion, all of the medical sources in the record are put on an equal plane and the ALJ accords them weight pursuant to the factors enumerated in 20 C.F.R. § 404.1527. At this point, the opinions of non-examining sources may

be accorded greater weight than those of examining sources." *Hicks v. Colvin*, Civil Action No. 1:12-cv-1663-JEC, 2014 WL 3573732, at *8 (N.D. Ga. July 21, 2014) (citing *Lamb*, 847 F.2d at 703).

*Credibility*.

In the second assignment of error, Tincher contends that the ALJ did not articulate adequate reasons to support the finding that her reports of subjective symptoms were not entirely credible. As part of this argument, she also asserts that the ALJ did not adequately consider the side effects from her medication.

If an ALJ decides not to credit a claimant's testimony as to pain and other subjective symptoms, he must articulate explicit and adequate reasons for doing so. *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995). In this case, the ALJ articulated three reasons to support his credibility finding: (1) the medical evidence in the record establishes fewer functional limitations than alleged; (2) Tincher's prescribed course of treatment and activities of daily living diverge from her testimony at the hearing; and, (3) the opinion evidence in the record to which the ALJ gave significant weight establishes that her RFC is greater than she alleged. R. 30. Each of these reasons is supported by the ALJ's thorough examination of the record and analysis.

Tincher asserts that the ALJ misstated the record evidence regarding her activities of daily living. She argues that the ALJ did not properly consider her complaints of limitations arising from pain, including that her son helped in cooking and caring for their pets and that she had difficulty with overhead activities and housework. The ALJ did not disregard these facts. Rather, he found that she did not have a moderate impairment in activities of daily living because "there is not a serious difficulty performing activities of daily living without direct supervision, or

17

in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions." R. 29. This finding is supported by the record as a whole. *See Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011) (per curiam) ("The question is not . . . whether [the] ALJ could have reasonably credited [the claimant's] testimony, but whether the ALJ was clearly wrong to discredit it.").

As for side effects of medication, the only record evidence of such side effects are written disability reports prepared by Tincher. Tincher did not testify about limitations due to side effects of medication at the ALJ's hearing. Tincher does not cite to evidence in the record in which she complained about the side effects to her treatment providers. Therefore, the ALJ did not err by failing to credit Tincher's reports of medication side effects. *Id.* at 938.

*Hypothetical Question to the VE.*

This assignment of error rests entirely on Tincher's argument that the ALJ's RFC assessment and hypothetical question to the VE were flawed for the reasons articulated in the first assignment of error. Doc. No. 26 at 51 ("The ALJ relied on a hypothetical that failed to reflect the significant nonexertional limitations opined by Dr. Hynes and the significant mental limitations opined by Dr. Braumiller."). Because I recommend that the Court find that the first assignment of error is not availing, I also recommend that the Court find that the third assignment of error in not well taken.

**RECOMMENDATION.**

For the reasons stated above, I **RESPECTFULLY RECOMMEND** that the final decision of the Commissioner be **AFFIRMED**. I further **RECOMMEND** that the Court direct

NOT FOR PUBLICATION

the Clerk of Court to issue a judgment consistent with its decision on this Report and Recommendation and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully Recommended** this 8th day of January 2015.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy